655 P.2d 1326

STATE of Arizona, Appellee,

v.

John ALLRED and Sandra
Allred, Appellants.

No. 5600–PR.

Supreme Court of Arizona,
En Banc.

Nov. 9, 1982.

Rehearing Denied Dec. 21, 1982.

Robert K. Corbin, Atty. Gen. by William
J. Schafer, III and David R. Cole, Asst.
Attys. Gen., Phoenix, for appellee.

Peter J. Cahill, Globe, for appellants.

HAYS, Justice.

Following a consolidated trial, the jury
found John Allred guilty of child molesta-
tion and his wife, Sandra Allred, guilty of
hindering prosecution. John Allred was
sentenced to seven years in the Arizona
State Prison and Sandra Allred was placed
on probation. The Court of Appeals af-
firmed.

We accepted this petition for review to determine whether the prior inconsistent statements of John Allred's daughter and stepdaughter were properly admitted into evidence.

John and Sandra Allred's four-year-old daughter was playing at the home of John Allred's niece, Edith Hughes, when she fell over a bicycle. Hughes examined Laura but found no injury. That evening John Allred took Laura and her half-sister Faith home.

The following day Laura was examined by Dr. Platt after Laura's mother, Sandra, discovered Laura was bleeding from her vagina. Sandra indicated Laura had injured herself when she fell over a bicycle while playing. Dr. Platt testified at trial that the injury to the vagina was such that it could not have occurred from falling over a bicycle and that Laura had been sexually molested.

Laura was called as a witness by the state during the second day of the Allreds' trial. She testified that she had fallen off her bicycle and hurt herself in between her legs. However, when the state subsequently asked Laura whether she remembered talking with Tommie Rasmussen, an investigator for the Gila County Attorney's Office, shortly after the bicycle accident, the following conversation ensued:

Q: Do you remember them [Rasmussen and colleague] asking you whether you fell off the bike?

A: Yeah.

Q: What did you tell them?

A: I told them I falled off the bike and the middle of my legs were bleeding.

Q: The middle of your legs were bleeding. Do you remember if anybody said is that really how it happened? Do you remember that?

A: Huh uh.

Q: No?

A: No.

Q: Do you remember telling Tommie that your daddy put his finger between your legs and that's how you got hurt?

A: Yeah.

Q: Do you remember telling him that? Were you telling him the truth, then?

A: Yeah.

Q: When did that happen?

A: A long time ago.

Q: It happened a long time ago?

A: Yeah.

Q: You didn't tell him it happened the day before?

A: It happened the day before.

Q: The day before you went to see the doctor?

A: Yeah.

Q: Is that when it happened?

A: Uh huh.

Q: Are you sure, now?

A: Yeah.

Q: Remember, you promised to tell the truth.

A: Yeah.

Q: You are telling us the truth?

A: Uh huh.

Q: And that's when it happened, right?

A: Yeah.

Defense counsel did not cross-examine Laura although he strenuously objected to the questions.

The prosecution next called Faith Davis, Laura's half-sister, as a prosecution witness. Despite defense counsel's continuing objections to leading questions, the state asked Faith about the events succeeding her sister's bicycle accident.

Q: Okay. Now, Faith, I want to ask you about the time when Laura fell off the bike, okay? Did you see your daddy do anything to Laura, put his fingers in between her legs and make her hurt?

A: Yes.

. . . .

Q: Okay. Where was Laura at?

A: She was in the bedroom.

Q: Was she on the bed?

A: Yes.

Q: Where was your daddy at?

A: On the bed.

Q: He was on the bed too. What do you remember seeing, Faith?

A: I forgot.

Q: You forgot.

A: (Nods yes).

When Faith was unable to relate the circumstances surrounding the alleged molestation, the prosecution questioned her regarding her prior conversation with Tommie Rasmussen, the investigator for the Gila County Attorney's Office. Faith testified she told Rasmussen that "[m]y daddy put his fingers in the middle of my sister's legs." Faith denied ever having told Rasmussen that her mother had instructed the girls to say Laura had fallen off a bicycle to prevent welfare from taking the girls from their home. Defense counsel cross-examined Faith. At that time she admitted having told Rasmussen that her sister hurt herself on the bike and stated that her daddy did not do anything to Laura.

The prosecution called Tommie Rasmussen as a witness. He testified regarding his conversation with four-year-old Laura.

A: I asked her if she would mind telling me what it was that had caused her to be at the [foster] home.

Q: Did she mind telling you?

A: She told me that she had been involved in a bicycle accident and had been injured.

Q: What was your response?

A: She also added something to that before I had a response.

Q: What did she add?

A: She added that her mother had told her to say that.

. . . .

A: I asked if she wanted to be truthful in what had happened to her.

. . . .

A: She indicated yes she did.

. . . .

A: She said she was at her home after being picked up from her aunt's, Mrs. Hughes. That she was sitting on her daddy's lap; that he had pulled her panties down. He had put his finger between her legs and inside her and hurt her. That she had gone to her mother and told her mother what had happened; that her mother had taken her bloody panties and washed them in the sink and had told her father you better not ever do that to her again and she said that she didn't think that he would because he said he wouldn't.

The state also called James A. McDonald, a psychologist, as a prosecution witness. He testified that Laura told him her father put his fingers into her and got on top of her everyday.

The defendants argue that prior inconsistent statements and testimony obtained as a result of out-of-court statements were the only evidence before the jury which indicated John Allred committed the crime of child molestation. The defendants also assert that Sandra Allred's guilt was established solely by the use of impeachment testimony. They argue that the impeachment testimony should not have been allowed because it was used substantively to convict and because the girls' out-of-court statements established the defendant's guilt. Defendants cite *State v. Cruz*, 128 Ariz. 538, 627 P.2d 689 (1981), to support this proposition.

> "Even though an out-of-court statement may be used to cast doubt on a witness' credibility, when it contains the dual purpose of tending to prove a defendant's guilt, it should not be admitted."

*Id.* at 540, 627 P.2d at 691.

This statement, however, was not the holding in *Cruz*. We went on to explain that

even though a statement may be admissible as an exception to the hearsay rule, 17A A.R.S., Rules of Evidence, rule 801, other rules may preclude its admission. Given the peculiar facts in *Cruz,* we concluded that rules 102[1] and 403[2] necessitated the inadmissibility of the impeaching statement which otherwise would have been admissible under rule 801(d)(1)(A).[3]

■ It has become obvious that some of our language in *Cruz* is subject to diverse interpretations. We therefore attempt here to lay down a more closely defined rule. We do not repudiate *Cruz* nor do we abandon *State v. Skinner,* 110 Ariz. 135, 515 P.2d 880 (1973). Our principal concern must focus on the danger of unfair prejudice when the impeaching testimony is used for substantive purposes. The following circumstances are among the factors to be considered:

1) the witness being impeached denies making the impeaching statement, and

2) the witness presenting the impeaching statement has an interest in the proceeding and there is no other corroboration that the statement was made, or

3) there are other factors affecting the reliability of the impeaching witness, such as age or mental capacity, ...

4) the true purpose of the offer is substantive use of the statement rather than impeachment of the witness,

5) the impeachment testimony is the only evidence of guilt.

The foregoing circumstances are not the only indicia of unfair prejudice which may arise in future cases, but in the main they suffice to illustrate our analysis in the instant case.

A comparison between the facts in *State v. Cruz, supra,* and the case at bench illustrates the inapplicability of the *Cruz* rule to the statements pertaining to John Allred and the applicability of that rule to those regarding defendant Sandra Allred. In *Cruz,* the witness, defendant's sister, denied having told the victim's girlfriend that the defendant had said, before the killing, that he was going to shoot the victim. The making of the statement was uncorroborated except by the testimony of the victim's girlfriend, who was, of course, understandably very interested in the outcome of the trial. Considering that the impeachment of defendant's sister by testimony from the victim's girlfriend was hardly a key issue at trial, that the question of whether the statement was actually made was very much in doubt and, under the rule of *State v. Skinner, supra,* once admitted for "impeachment" the statement would be very important substantive evidence of defendant's guilt on a key element, we held in *Cruz* that the so-called impeaching statement should not have been admitted. There are two reasons underlying the *Cruz* doctrine. The first is to be found in Rule 102, which mentions both the ascertainment of truth and the just determination of proceedings. There is, we think, an inherent danger that these objectives will be compromised when the key issue of guilt or innocence is likely to turn upon resolution of an issue of credibility in a "swearing contest" between interested witnesses from "opposing camps."

The second consideration involves Evidence Rule 403, which permits exclusion of

---

1. Rule 102 provides:

   "These rules shall be construed to secure fairness in administration, elimination of unjustifiable expense and delay, and the promotion of growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined."

2. Rule 403 provides:

   "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

3. Rule 801(d)(1)(A) provides:

   "(1) *Prior statement by witness.* The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with his testimony, ... "

278

evidence where its probative value is substantially outweighed by the danger of prejudice, confusion or misleading the jury. *Cruz* holds that it is an abuse of discretion for the trial court to permit the so-called impeachment of a witness by use of a statement which incorporates defendant's hearsay admission of a key element of the offense charged, when the impeachment purpose was clearly collateral to the substantive use of the statement and when the making of that statement was uncertain and could only be determined by a resolution of an issue of credibility between two very interested witnesses.

Both sides of the *Cruz* coin are illustrated in the case at bench. With respect to the charges against the father, John Allred, testimony from the niece and the doctor established that there had been sexual abuse of Laura, including penetration which was probably digital in nature. The effect of this testimony also effectively negated the contention that the vaginal injuries were the result of the bike accident. Thus, the crime was established by evidence aside from the statement, but the identity of the criminal was not, and was supplied by substantive use of the impeaching statement plus some rather confusing testimony in court from Faith, age seven. The state's offer of the statement to impeach the in-court testimony of the two girls was obviously motivated less by desire to attack the credibility of its five-year-old victim and seven-year-old witness and more by the desire to use Rule 801 as a device to secure the admission of otherwise inadmissible hearsay which could then be used substantively under the *Skinner* rule for the purpose of connecting the father to the crime. This, of course, raises the very dangers mentioned above with regard to the Cruz case. However, here, unlike *Cruz*, the witnesses being "impeached" admitted making the statements involving the father, and the collateral question of credibility which could be so misleading in *Cruz*, is not present.

■ Thus, we conclude with regard to the defendant, John Allred, the impeaching testimony was reliable to the extent that it is not an abuse of discretion for the trial court to hold that the probative value outweighed any danger of prejudice. The two young girls who testified admit having made the impeaching statements, the witness relating the statements has no personal or deep interest in the proceeding and there is compelling evidence that the crime was committed.

■ However, with regard to the charge against Sandra Allred, the statement used for impeachment is denied and the fact of its having been made was not corroborated. The extrajudicial statement is that of a very young child. In view of these factors, the index of reliability of the statement is low. There was no real intent or need to impeach the witness. The impeachment was a pretense for substantive use of an otherwise inadmissible hearsay statement. If admitted, the statement would form the only evidence that the crime was committed and that the defendant was the perpetrator. We conclude that the danger of *unfair* prejudice and unjust determination is so great under these circumstances that the admission of the statement and its use to provide substantive evidence of the crime and defendant's guilt is an abuse of discretion.

The opinion of the Court of Appeals, 134 Ariz. 279, 655 P.2d 1331, is vacated. The judgment of conviction and the sentence of John Allred are affirmed. The judgment of conviction and the sentence of Sandra Allred are reversed and remanded.

HOLOHAN, C.J., GORDON, V.C.J., and CAMERON and FELDMAN, JJ., concur.