836 P.2d 982

The STATE of Arizona, Appellee,

v.

Rudolph Noel PETZOLDT, Appellant.

Nos. 2 CA–CR 90–0735,
2 CA–CR 90–0736.

Court of Appeals of Arizona,
Division 2, Department A.

Dec. 31, 1991.

Review Denied Oct. 6, 1992.

dock as independent grounds for summary judgment.

Grant Woods, Atty. Gen. by Paul J. McMurdie and Bruce M. Ferg, Phoenix, for appellee.

Kenet E. Chareau, Tucson, for appellant.

## OPINION

HOWARD, Judge.

Appellant Rudolph Petzoldt was convicted by a jury of seven charges: one count of illegally conducting an enterprise; five counts of possession of marijuana for sale; and one count of conspiracy. Some of his sentences are concurrent and some consecutive. He was sentenced to a maximum total of ten years' imprisonment. We affirm.

The facts, viewed in a light most favorable to sustaining the verdict, *State v.*

*Zmich,* 160 Ariz. 108, 770 P.2d 776 (1989), are as follows. Guillermo Soto–Leal had studied accounting for two years. In the summer of 1983, Soto–Leal was hired by Jaime Figueroa–Soto. Figueroa–Soto was in the marijuana business and had problems because the records of amounts of marijuana arriving in Tucson did not agree with the records of the amounts shipped from Nogales. Figueroa–Soto sent Soto–Leal to Tucson to keep accurate records.

People in Figueroa–Soto's business were referred to only by first names or nicknames. When Soto–Leal arrived in Tucson he was introduced to "Don Chuy," the man in charge of Figueroa–Soto's Tucson operations. Don Chuy introduced Soto–Leal to other people who worked for Figueroa–Soto in Tucson, including Roberto, who was in charge of weighing the marijuana and keeping records. Soto–Leal familiarized himself with how the business functioned and then inventoried the marijuana. He collected the small notebooks that had been used by Don Chuy, Roberto, and others to record the amounts of marijuana received or delivered. Soto–Leal conferred with these record keepers in order to resolve discrepancies between the notebooks. He then transferred the information to larger notebooks, burning some of the small notebooks after he finished with them.

One of the larger notebooks is green and was designated Exhibit 18 at trial. This notebook contains entries for five sales to "Rudy" and these sales are also shown in Don Chuy's books. Soto–Leal gave the green notebook to Figueroa–Soto in October 1983. Figueroa–Soto was pleased with Soto–Leal's records. He met with various clients and had the green notebook in his possession. At one such meeting in October 1983 which Soto–Leal attended, Figueroa–Soto spoke with a client called Rudy. Don Chuy was also present at this meeting and Soto–Leal testified that Figueroa–Soto spoke with Rudy about the notations in the green notebook. These notations detailed amounts of marijuana received, money received, and money paid.

Other records showed that Rudy received shipments and made payments after the October 1983 meeting. Initially, Don Chuy had introduced Soto–Leal to various clients, including Rudy. Later, Soto–Leal made marijuana deliveries to both Rudy and Rudy's brother, Chuck. Rudy and Chuck lived in the same house. In addition, Soto–Leal testified that he would use the same phone number to reach Chuck as he would to reach Rudy.

On March 23, 1984, Soto–Leal was arrested at a house in Tucson. Tons of marijuana were seized from this house and the authorities found many records, including some of the notebooks which contain records of the marijuana business. Other notebooks were recovered at other stash houses which the police discovered.

Soto–Leal was convicted in federal court and received consecutive terms totaling 45 years. After serving several years, Soto–Leal became a cooperating witness and began to testify against the people in Figueroa–Soto's marijuana business. In return, Soto–Leal's sentences were reduced.

Rudolph Petzoldt was identified by Soto–Leal in a photo line-up as the Rudy that Soto–Leal had met while working for Figueroa–Soto. Soto–Leal also identified Petzoldt as Rudy at trial. Soto–Leal testified that there was no other client in Tucson with a name similar to Rudy.

## I.

■ Petzoldt argues that the trial court erred when it admitted the notebooks as business records. We do not agree.

We begin by recognizing that the notebooks are hearsay because they were offered to prove the truth of the matter asserted within them, that is, that there were marijuana transactions between Figueroa–Soto and Petzoldt. Ariz.R.Evid. 801, 17A A.R.S. But if the notebooks fall within an exception to the hearsay rule they are admissible. Rule 803(6) sets forth the business record exception to the hearsay rule:

> **Records of regularly conducted activity.** A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, if:
>
> (a) Made at or near the time of the underlying event,

(b) by, or from information transmitted by, a person with first hand knowledge acquired in the course of a regularly conducted business activity,

(c) made and kept entirely in the course of that regularly conducted business activity,

(d) pursuant to a regular practice of that business activity, and

(e) all the above are shown by the testimony of the custodian or other qualified witness.

However, such evidence shall not be admissible if the source of information or the method or circumstances of preparation indicate a lack of trustworthiness or to the extent that portions thereof lack an appropriate foundation.

The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

"The determination of whether, in all the circumstances, [business] records have sufficient reliability to warrant their receipt in evidence is left to the sound discretion of the trial judge." *Saks International Inc. v. M/V "Export Champion,"* 817 F.2d 1011, 1013 (2nd Cir.1987). Petzoldt contends there is no evidence the scriveners had the requisite first-hand knowledge at the time the entries were made in the notebooks. We find no merit to this contention. There is ample testimony by Soto–Leal that records were entered contemporaneously by scriveners with first-hand knowledge. For example, he testified that entries of the amounts of marijuana were recorded at the time the marijuana was weighed. Soto–Leal also testified that payments were usually recorded by Don Chuy, who collected and counted the money. As for the information which Soto–Leal copied from one notebook into another, Rule 803(6) specifically allows data compilation if the information is either by or transmitted by someone with first-hand knowledge.

Petzoldt maintains that because different sizes of notebooks were used there was no regular practice. Rule 803(6) states the records may be in any form; it does not require physical uniformity of the records. Rule 803(6)(d) requires a regular practice. There was a great deal of evidence which showed that keeping records was a regular practice in Figueroa–Soto's business. The importance of this practice to Figueroa–Soto himself is shown by his employment of Soto–Leal to solve previous problems related to record-keeping.

Petzoldt also argues that Soto–Leal's testimony indicates a lack of trustworthiness. He claims that because Soto–Leal testified the writers were often tired and frequently had taken cocaine, the notebooks are unreliable. While exhaustion and use of cocaine might indicate a lack of trustworthiness in some situations, there is no persuasive evidence in this situation that those factors caused the records to be unreliable here. On the contrary, there was substantial evidence that the records were reliable. It was undisputed that Soto–Leal was brought to Tucson by Figueroa–Soto to correct the problems in record-keeping and that Soto–Leal had an accounting background. Soto–Leal testified that the practice had been for several people to keep overlapping records and that he conferred with Don Chuy and other workers to resolve discrepancies before producing the data compilation in the large notebook which he presented to Figueroa–Soto. Furthermore, the records were accepted as reliable by Figueroa–Soto and there is no evidence of any client ever complaining about the records' accuracy.

Petzoldt next contends that because all the writers of the notebooks before Soto–Leal's arrival have not been identified, the notebooks are unreliable. we disagree. "[T]here is no requirement that the person whose first-hand knowledge was the basis of the entry be identified, so long as it was the business entity's regular practice to get information from such a person." *Saks,* 817 F.2d at 1013 (2nd Cir.1987).

Petzoldt further argues that the notebooks contain hearsay statements themselves and the state must therefore show that the underlying statements are admissible under a hearsay exception as well. Petzoldt relies on *State v. McGann,* 132 Ariz.

296, 645 P.2d 811 (1982). *McGann* is distinguishable, as it involved underlying hearsay which did not fit within the 803(6) exception because the statements were made by a customer of the business rather than a business employee. Here, there is no evidence that anyone other than Figueroa–Soto's employees made entries in the notebooks. When a regularly kept business record includes a further hearsay statement, if that hearsay statement is by a person acting in the routine of the business, the regularly kept records exception applies to the entire record and no further exception need be invoked. *McCormick on Evidence*, E. Cleary, § 324.3 (3rd ed. 1984). For this same reason we find without merit Petzoldt's argument that Rule 805 concerning hearsay within hearsay is applicable here. In conclusion, we find no abuse of the trial court's discretion in admitting the notebooks.

## II.

■ Petzoldt next argues that even if we find that the notebooks were properly admitted as business records, their admission results in a violation of his confrontation rights under the sixth amendment to the United States Constitution. We disagree. Firmly rooted exceptions to the hearsay rule do not violate the confrontation clause. *United States v. Baker*, 855 F.2d 1353 (8th Cir.1988), *cert. denied*, 490 U.S. 1069, 109 S.Ct. 2072, 104 L.Ed.2d 636 (1989). The business records exception is such a firmly rooted exception. *Id.*

Petzoldt also invokes the confrontation provision of the Arizona Constitution. Petzoldt, however, merely raises this claim but fails to argue why we should analyze our provision differently from the federal one. We therefore consider this claim as abandoned. *State v. Blodgette*, 121 Ariz. 392, 590 P.2d 931 (1979).

## III.

■ Petzoldt maintains that because the only evidence of corpus delicti here (i.e., possession of marijuana for sale) was the notebooks, even if the notebooks are admissible, they should not have been admitted on the basis that they were highly prejudicial under Rule 403, which states, in pertinent part, that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice...." Here, the probative value of the notebooks, showing Petzoldt's purchases of marijuana from Figueroa–Soto, outweighs any alleged danger of unfair prejudice. We review a trial court's decision to admit or exclude evidence deferentially and are required to consider the evidence in the light most favorable to the evidence's proponent, which entails maximizing its probative value and minimizing its prejudice. *State v. Castro*, 163 Ariz. 465, 788 P.2d 1216 (App.1989).

The notebooks were not the only evidence of corpus delicti. Soto–Leal testified to having personally delivered marijuana to Petzoldt on two occasions and although he could not recall the exact dates he testified that on both occasions he saw Petzoldt. Soto–Leal also testified that he was present on several occasions when Don Chuy collected money from Petzoldt for marijuana and Soto–Leal stated that he spoke with Petzoldt on these occasions. Petzoldt's argument that the notebooks are the only evidence of corpus delicti is, therefore, without merit. Similarly, the admission of the notebooks was not unduly prejudicial.

Petzoldt's reliance on *State v. Allred*, 134 Ariz. 274, 655 P.2d 1326 (1982), for the proposition that such hearsay evidence may not be used as the sole evidence to convict is misplaced. In that case our supreme court held that the state used hearsay evidence ostensibly introduced for impeachment purposes for improper substantive purposes. The hearsay was the only evidence in that case involving a husband and wife that the wife committed a crime. Here, however, the notebooks are admissible hearsay and were neither introduced to impeach nor were they the only evidence of the crimes.

## IV.

■ Petzoldt next asserts that there was insufficient evidence to support a convic-

tion of conducting an illegal enterprise. Arizona's statute is adapted from the federal Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968. If there are no relevant Arizona cases, we look to federal courts for guidance in construing and applying our statute. *Baines v. Superior Court,* 142 Ariz. 145, 688 P.2d 1037 (App.1984). Under A.R.S. § 13–2312(B), "[a] person commits illegally conducting an enterprise if such person is employed or associated with any enterprise and conducts or participates in the conduct of such enterprise's affairs through racketeering."

Petzoldt alleges that if the state is able to prove anything it is only able to prove that he is Figueroa–Soto's customer. Mere customers, Petzoldt continues, are neither employed by nor associated with an enterprise. Petzoldt cites *United States v. Forsythe,* 429 F.Supp. 715 (W.D.Pa.1977), for the proposition that "associated with" refers to parties "inside" the enterprise and customers are not inside the enterprise. That case, however, was reversed by the Third Circuit Court of Appeals and the circuit court held that Congress intended for RICO to be liberally construed. Therefore, the term "associated with" is defined as "direct or indirect participation in the conduct of the enterprise." *United States v. Forsythe,* 560 F.2d 1127, 1136 (3rd Cir. 1977). Similarly, the Ninth Circuit has held that outsiders who associate with and participate in the affairs of a racketeering enterprise fall within RICO's strictures. *United States v. Tille,* 729 F.2d 615, (9th Cir.), *cert. denied,* 469 U.S. 845, 105 S.Ct. 156, 83 L.Ed.2d 93 (1984). We find sufficient evidence to support Petzoldt's conviction of conducting a criminal enterprise.

## V.

Petzoldt also argues that prejudicial hearsay testimony by Lea Peterson, fiancée to Petzoldt's brother, was improperly admitted. The trial court admitted stipulated evidence that Peterson listed her address and Petzoldt's brother's address as a house on Grinnell Street, thereby providing some link between Petzoldt and that house.

There was a discussion concerning the admissibility of information which apparently was provided by Peterson at a federal bond hearing after her own arrest. The state concedes that this evidence was hearsay that did not fit within any exception. We agree. However, the admission of that evidence was harmless error because of the overwhelming amount of other evidence identifying Petzoldt as the person involved in the drug trafficking activities and linking him to the Grinnell house. Such other evidence includes Soto–Leal's identification of Petzoldt in the photo line-up and in court, Soto–Leal's testimony that he personally delivered marijuana to Petzoldt and that Petzoldt paid Don Chuy for marijuana, evidence that deliveries of marijuana to Petzoldt were made to the house on Grinnell Street where both Petzoldt and his brother lived, and evidence that Soto–Leal could telephone both brothers at a single telephone number which was for the house on Grinnell Street.

## VI.

Petzoldt also claims that the trial court erroneously denied his motion to dismiss for pre-indictment delay. This claim is based on the fact that he was not tried until 1990 for crimes committed in 1983 and revealed in the notebooks seized in 1984. He argues that if the trial had been in 1984 then more notebook scriveners would have been available and subject to confrontation and that this delay amounts to prejudice per se.

Petzoldt relies on *State v. Hall,* 129 Ariz. 589, 633 P.2d 398 (1981), in which our supreme court held that "[f]or pre-indictment delay to violate due process, the appellants must show that the delay was intended to gain a tactical advantage or to harass them and that the delay actually and substantially prejudiced them." 129 Ariz. at 592–93, 633 P.2d at 401–402. Petzoldt does not argue that the delay was motivated by any attempt for tactical advantage or harassment. As for his argument that the delay was prejudicial, he has misread *Hall.* In *Hall* the court stated that due process is not violated if all appellants are able to

point to is "a general unavailability of witnesses but they do not specify what [exculpatory] information was lost to them by reason of delay." *Id.* at 593, 633 P.2d at 402. Here, Petzoldt does not specify what exculpatory information was lost. His reliance on *Hall*, therefore, is misplaced.

Petzoldt also cites *Hinson v. Coulter*, 150 Ariz. 306, 723 P.2d 655 (1986), for the proposition that delay can become prejudicial per se. *Hinson*, however, does not concern preindictment delay but applies to delay between arrest and trial.

When the trial court denied Petzoldt's motion to dismiss, it made the following findings:

> Regarding the defendant's motion for dismissal based upon pre-indictment delay, the facts as presented to the Court establish that the government could have, at one time prior to May of 1988, obtained an indictment against Rudolph Petzoldt. The Court, however, finds that law enforcement had legitimate and valid reasons to forego an immediate—an earlier arrest and prosecution of Rudolph Petzoldt in order to engage in a more extensive investigation and prosecution of other defendants.
>
> The Court also finds significant that the defendant is unable to establish any prejudice that would merit a dismissal or that delay in and of itself was in any way intended to obtain an unfair advantage of the defendant. So, motion to dismiss for pre-indictment delay is denied.

Petzoldt does not argue nor does the record show illegitimate reasons for the delay. We find that the trial court properly denied his motion to dismiss for pre-indictment delay.

## VII.

▮ Petzoldt further claims that the trial court erred in classifying the conspiracy as a class 2 felony. We disagree. The conspiracy count charged that Petzoldt conspired with Figueroa–Soto, Soto–Leal, and others, to possess marijuana for sale, to transport marijuana, and to sell marijuana in furtherance of the conspiracy. The jury found Petzoldt guilty of the conspiracy count. Under the version of A.R.S. § 13–

3405 in effect when Petzoldt committed his offenses, sale and transportation were both class 2 felonies. (1981 Ariz.Sess.Laws (1st Reg. Sess.) Ch. 264, § 8.) Petzoldt concedes, in his reply brief, that conspiracy to sell or transport were class 2 felonies at the time of the offenses. Petzoldt's assertion of error is flawed because he does not acknowledge that the conspiracy count included not only possession of marijuana for sale (a class 4 felony) but also sale of marijuana. A.R.S. § 13–1003(C) provides that the degree of conspiracy shall be determined by the most serious offense conspired to. Moreover, our legislature reiterates this policy by stating that, other than conspiracy to commit a class 1 felony, "conspiracy is an offense of the same class as the most serious offense which is the object of or result of the conspiracy." A.R.S. § 13–1003(D). The trial court properly treated the conspiracy conviction as a class 2 felony.

## VIII.

▮ Petzoldt's final argument is that the trial court improperly permitted comment by the prosecutor regarding Petzoldt's failure to present evidence. During the rebuttal argument, the prosecutor stated that although the defense does not have the burden to produce evidence, if the defense counsel had something that he thought was important to consider, he has subpoena power. Petzoldt objected that this comment constituted improper argument. We do not agree. The prosecutor was referring to people who could have been subpoenaed, that is, people other than Petzoldt. The comments do not draw attention to Petzoldt's silence. Furthermore, in *State v. Floyd*, 120 Ariz. 358, 586 P.2d 203 (App.1978), we held a similar comment about a defense counsel's subpoena power was proper because it was not a comment on the defendant's failure to testify.

Affirmed.

LIVERMORE, C.J., and LACAGNINA, P.J., concur.